IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERTA J. GODFREY,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 2:12-cv-1014-TC<br><br>Judge Tena Campbell |

Roberta J. Godfrey seeks judicial review of the decision of the Commissioner of Social Security denying Mrs. Godfrey's application for disability insurance benefits under Title II of the Social Security Act.  42 U.S.C. § 401 *et al.*  After a careful review of the record and for the reasons discussed below, the court finds that the Commissioner's decision is supported by substantial evidence and is therefore AFFIRMED.

BACKGROUND

I.      **Procedural History**

Mrs. Godfrey alleges that she suffered a work-related injury on October 10, 2001, that left her disabled as a matter of law.  Mrs. Godfrey claims that she is disabled due to severe impairments including "degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, obesity, a right shoulder impingement, and depression."  (Pl.'s Opening Br., Docket No. 17 at 1.)

Mrs. Godfrey filed her first application for disability insurance benefits in May 2002.  Her

application alleged that her disability began October 10, 2001, due to "degenerative disc disease, migraine headaches, right arm injury, inability to sit, stand or walk for more than 20 minutes at a time, and mood swings." (R. 15, 62.) The first application was administratively denied. Mrs. Godfrey requested reconsideration of the denial of her application, and it was determined that the application was properly denied.

Mrs. Godfrey filed her second application in May 2003. This second application was administratively denied in October 2003. Mrs. Godfrey requested reconsideration of the denial, and in February 2004, it was determined that it was properly denied. Subsequently, Mrs. Godfrey requested a hearing, which was held on June 17, 2005, in front of Administrative Law Judge (ALJ) Robin L. Henrie. Judge Henrie denied Mrs. Godfrey's claim and found that she was not disabled as a matter of law. In March 2006, the Social Security Appeals Council (Appeals Council) denied review of Judge Henrie's decision.

In October 2007, Mrs. Godfrey sought review by this court of Judge Henrie's decision. United States Magistrate Judge Paul Warner granted the Commissioner's unopposed request to remand for further proceedings under 42 U.S.C. § 405(g). Upon remand, ALJ Gilbert A. Martinez held a second hearing on February 20, 2008. On April 21, 2008, Judge Martinez issued a decision finding Ms. Godfrey not disabled. In September 2009, Mrs. Godfrey filed written exemptions to Judge Martinez's decision. The Appeals Council reviewed and remanded the case to ALJ Donald R. Jensen.

Judge Jensen held a third hearing on January 20, 2010. Like the ALJs before, Judge Jensen also found that Mrs. Godfrey was not disabled between her alleged onset of disability in October 2001 to her date last insured, December 31, 2007. The Appeals Council denied Mrs.

Godfrey's request for review of Judge Jensen's decision, making it the Commissioner's final decision for purposes of judicial review. Mrs. Godfrey seeks review of this decision.

In January 2006, Mrs. Godfrey filed a third application for disability insurance benefits and it was administratively denied. Mrs. Godfrey requested reconsideration of the denial, and it was determined that the previous determination denying her claims was proper.

## II.   Factual Background

Mrs. Godfrey was forty-one years old when she alleges she became disabled. She has a college degree in Interior Design and in the past, worked as a bank teller, financial services sales representative, office manager, data entry operator, and administrative clerk.

### A.   Medical Evidence

Mrs. Godfrey claims that she became disabled when she tripped on a carpet at her workplace in October 2001. Mrs. Godfrey stopped working after her injury. She claims that she immediately experienced back pain and back spasms and sought treatment from Charles M. Bova, M.D., who prescribed a muscle relaxant and Motrin for her back pain.

Mrs. Godfrey returned to Dr. Bova for a followup on October 12, 2001, because she was still experiencing pain in her lower back and claimed that the medications were not helping. Dr. Bova prescribed Lortab and instructed Mrs. Godfrey to continue taking the previously prescribed muscle relaxant and Motrin. Mrs. Godfrey returned for another followup on October 31, 2001, and Dr. Bova referred her to a spinal specialist for further evaluation.

Spinal specialist Alan Brown, M.D., diagnosed Mrs. Godfrey with "probable degenerative disc disease." (R. 201.) He believed that Mrs. Godfrey's back pain was "discogenic pain," or pain stemming from the degenerative discs in her spine. On December 4, 2001, Dr.

Brown's recommendation for Mrs. Godfrey was to "continue with conservative management," which included continuing her prescribed medications and starting physical therapy for lumbar stabilization. (R. 196.) Dr. Brown noted that if this conservative treatment plan did not work for Mrs. Godfrey within six weeks, he would recommend epidural steroid injections.

Mrs. Godfrey returned to work sometime in December 2001 until she fell again on December 18, 2001. After her second fall, Mrs. Godfrey made another appointment with Dr. Brown. Dr. Brown believed that Mrs. Godfrey's fall "aggravated her underlying degenerative disk disease," and he recommended that she leave work for two weeks. (R. 195.)

In January 2002, Jeff Chung, M.D., evaluated Mrs. Godfrey for the Labor Commission of Utah. Dr. Chung found that Mrs. Godfrey had a normal range of motion in her right arm, but still complained of discomfort at the end range of motion. Mrs. Godfrey complained of painful "pops" when moving her arm, but Dr. Chung stated that he "personally could not hear such crepitation or feel crepitation during [his] evaluation." (R. 163.) Dr. Chung observed that Mrs. Godfrey had full strength throughout the examination and no apparent sensory deficits. He described Mrs. Godfrey's examination as relatively nonspecific, but also stated that "[t]he patient currently has a plethora of subjective complaints of pain and discomfort without objective findings consistent with a neuromuscular origin to the patient's current symptoms." (R. 165.) Dr. Chung noted that Mrs. Godfrey had "positive Waddell's findings, such as significant increase in pain and discomfort in the lumbar spine with en-block rotation of the lumbar spine" and that these Waddell's findings indicate that she "may have a significant nonorganic component to her current symptoms." (Id.)

Mrs. Godfrey returned to Dr. Brown on January 18, 2002.  Dr. Brown observed that Mrs. Godfrey was still having "quite a bit of pain," but that her overall condition had improved. ®. 194.)  He stated that she should be kept off work for another six weeks, and that she should continue with physical therapy and her current medications.

Mrs. Godfrey's physical therapists performed a functional capacity assessment on her on February 22, 2002.  Her physical therapists observed that she could lift up to twenty pounds and that she exhibited signs that she was giving only "submaximal or unreliable effort."  ®. 634.)

Mrs. Godfrey continued to experience pain throughout 2002.  In July 2002, Dr. Brown referred her for an epidural steroid injection procedure.  On July 10, Dr. Bova performed the epidural steroid injection.  Though she suffered from some headaches and fevers after the injection, Mrs. Godfrey described her pain to Dr. Brown as a "one" on a one out of ten scale.  By October 2002, Dr. Brown still recommended conservative treatment and epidural steroid injections as the best course of treatment for Mrs. Godfrey.

In July 2002, Mrs. Godfrey underwent another functional capacity assessment for her worker's compensation claim.  Dennis Taggart, M.D., found that Mrs. Godfrey could occasionally lift twenty pounds and frequently lift ten pounds.  He found that she could "stand and/or walk (with normal breaks) for a total of – about 6 hours in an 8-hour day" and sit for about "6 hours in an 8-hour workday."  ®. 227.)  Dr. Taggart stated that Mrs. Godfrey had some postural limitations, but no apparent manipulative, visual, communicative, or environmental limitations.

Mrs. Godfrey did not seek any treatment between October 2002 and November 2003.[1]

On August 14, 2003, David Robert Heiner, M.D., examined Mrs. Godfrey on behalf of the Division of Disability Determination Services to evaluate her physical limitations. Dr. Heiner observed evidence of carpal tunnel syndrome in Mrs. Godfrey's right wrist and tenderness in her spine and in the right side of her body. She had a normal range of motion in her fingers, hands, elbows, and shoulders, but showed positive impingement signs in her right shoulder. Dr. Heiner assessed Mrs. Godfrey with degenerative disc disease in her neck and lower back, shoulder impingement syndrome with a possible degenerative AC joint, and carpal tunnel syndrome in her right side.

In September 2003, a panel of workers' compensation physicians reviewed Mrs. Godfrey's medical records and examined her to evaluate the impacts of her falls. Mrs. Godfrey was asked to complete a survey and was directed to circle the levels of severity for her pain with "zero being no pain and ten being the most severe pain one could imagine." ®. 213.) Mrs. Godfrey circled "ten" for the severity of her pain at its worst, for frequency of pain, for pain interfering with family/partner/significant others, for pain making it almost impossible to engage in any sexual activity, for overall mood during the past week, feeling depressed in the past week because of the pain, and being irritable because of the pain. She circled numerous categories under "nine," "eight," "seven," and "six," but did not circle any ratings for "zero," "one," "two," "three," "four," or "five." ®. 213.) Madison Thomas, M.D., writing for the panel, reported that "[t]hroughout the examination, it was noted that manual muscle tests and sensory patterns were

_____

[1]Mrs. Godfrey visited Dr. Brown in May 2003 to complete some paperwork, but not for treatment.

inconsistent and some exaggeration of behavior was obvious to the panel members, making final interpretation somewhat difficult." (R. 215.)  At the end of the examination, Dr. Thomas concluded that Mrs. Godfrey's fall in October 2001 caused her back injury, the December 2001 fall aggravated the injury, and she became medically stable around July 2002.

In October 2003, Richard Sander, M.D., reviewed Mrs. Godfrey's medical records to evaluate her physical limitations.  He observed that she could lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.  He also found that Mrs. Godfrey had some postural limitations and a possible shoulder impingement that limited her ability to reach.  Dr. Sander stated he believed that Mrs. Godfrey's symptoms were attributable to a medically determinable impairment, but he also found that the severity or duration of her claimed symptoms were "disproportionate to the expected severity or duration on the basis of her medically determinable impairment(s)." (R. 262.)

Mrs. Godfrey returned to Dr. Brown on January 23, 2004 and complained of back pain, neck problems, and headaches.  She told Dr. Brown that she wanted to "hold off on any further treatment until [her workers' compensation claim] is settled." (R. 678.)  Dr. Brown recommended that Mrs. Godfrey return for a followup visit "as necessary." (Id.)

Mrs. Godfrey did not seek any treatment between January 2004 and August 2004.  In August, Mrs. Godfrey began receiving treatment from Burk Young, M.D., for pain and numbness in her right arm.  Dr. Young's first impressions included a rotator cuff strain in Mrs. Godfrey's right shoulder, a possible tear, and carpal tunnel syndrome.

Mrs. Godfrey followed up with Dr. Young in April 2005. At that time, Dr. Young referred her for an MRI of her lumbar spine and a lumbar spine epidural steroid injection. The MRI showed that Mrs. Godfrey had a full thickness rotator cuff tear and an electroneurodiagnostic study confirmed moderate carpal tunnel syndrome in her right wrist.

In May 2005, Dr. Young surgically repaired Mrs. Godfrey's rotator cuff tear. Three weeks after the surgery, she reported to Dr. Young that she was experiencing diminishing pain. After about two-and-a-half months, Dr. Young reported that Mrs. Godfrey was making "slow but steady progress" and had "full passive range of motion." ®. 721.) He also stated that she described to him that she "feels like she is better than before the surgery." (Id.) Three months after the surgery, she was not experiencing the pain that she had before the surgery and had full range of motion, though she found it difficult to lift her arm above the shoulder. By September 2005, Dr. Young noted that Mrs. Godfrey had gained strength in her shoulder and had mild pain with impingement testing. Dr. Young recommended that Mrs. Godfrey continue with independent physical therapy and that "she could return to work with some restrictions of no overhead lifting and only about 20 lbs below shoulder level for at least six more weeks. We will see her back in six weeks and hopefully lift all these restrictions." ®. 329.)

In October 2005, Mrs. Godfrey had an epidural steroid injection in her lumbar spine. When she returned to Dr. Brown for a followup, she stated that the injection gave her short term relief, but that she was beginning to experience pain again. She also told him that she "only take[s] Celebrex and occasional Tylenol." ®. 322.) Dr. Brown gave Mrs. Godfrey Lortab for break through pain and recommended that she followup in three to four months and to only call if she had problems before then.

Mrs. Godfrey returned to Dr. Young in November 2005, nearly six months after her rotator cuff surgery. She claimed that she felt 90% better. Because of her progress with her shoulder, Dr. Young discharged her from his care. During her visit, she primarily complained about pain in her elbow and described how she experienced "locking and catching." ®. 328.) An x-ray showed a possible small bone chip and a CT scan showed mild osteoarthritis.

In January 2006, Mrs. Godfrey visited Dr. Young again for her carpal tunnel. They discussed options of treatment, and Dr. Young recommended "conservative care" as the best method at the time. ®. 324.) He advised Mrs. Godfrey to try wearing a splint at home, but if she continued to have symptoms, then they could consider a carpal tunnel release. Conservative treatment failed to resolve Mrs. Godfrey's carpal tunnel, and in April 2006, Dr. Burk performed carpal tunnel release surgery on her right wrist. After her surgery, Dr. Burk stated that Mrs. Godfrey had no more complaints of pain or numbness and was doing "excellent." ®. 796-97.)

Mrs. Godfrey returned to Dr. Brown in February 2006 for her back pain. She told him that she was doing "relatively well" and that "with 400 mg of Celebrex and one Lortab a day her pain is tolerable for her." ®. 670.) Dr. Brown only refilled her prescriptions and did not recommend any other treatment.

In June 2006, Mrs. Godfrey was doing yard work when she became short of breath. Mrs. Godfrey went to the emergency room and was admitted with pulmonary embolus. She was discharged with pulmonary embolus with respiratory stability.

In July 2006, Mrs. Godfrey began to receive treatment for her back pain from Timothy Grange, M.D., after Dr. Brown stopped practicing in the area. Dr. Grange noted that Mrs. Godfrey had fluid movements, and her range of motion in her neck and low back were

"essentially full."  ®. 834.)  He also noted that she was "seated comfortably in no acute distress, is alert, cooperative . . ."  (Id.)  After assessing her lower back pain and cervical pain, Dr. Grange recommended that Mrs. Godfrey "continue with a stretching and exercise program."  (Id.)  He refilled her Lortab and prescribed a long-acting pain medication.  Mrs. Godfrey continued to see Dr. Grange throughout 2006 and told him that she was feeling "overall a little better."  ®. 832.)  Dr. Grange recommended that Mrs. Godfrey continue with her stretching and exercise program and prescribed pain relievers.  In December 2006, Dr. Grange imposed permanent restrictions on Mrs. Godfrey to avoid heavy lifting and to frequently change positions.

Later in July 2006, non-examining physician Lewis Barton, M.D., reviewed Mrs. Godfrey's medical records for her disability determination.  Dr. Barton stated that Mrs. Godfrey could lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk about six hours in an eight-hour workday; and sit for six hours in an eight-hour workday and that she had no postural, visual, communicative, or environmental limitations.  Dr. Barton found that Mrs. Godfrey's allegations of pain were "somewhat credible per [the Medical Evidence of Record]." ®. 821.)  In his overall conclusion, Dr. Barton stated:

> Claimant has not had many new changes since her denial in 11/22/05 except for her right carpal tunnel release in 4/06, which per her notes of 5/26/06 "she is doing excellent."  She is also doing well with both her shoulder and elbow, and is being followed and managed for her back pain.  [Activities of Daily Living (ADLs)] are semi active, but MER does not support how bad ADLs say she is.  Although her ADLs speak a lot of pain and migraines and overwhelming pain and blurred vision from headaches, there is no mention of headaches or migraines in the MER.  MER states pain is controlled through meds.

(Id.)  Based on his review of Mrs. Godfrey's medical records, Dr. Barton opined that Mrs. Godfrey could do light work with some restrictions.

In April 2007, Mrs. Godfrey's attorney requested that Dr. Grange fill out a physical capacity form for Mrs. Godfrey's social security case. On the form, Dr. Grange diagnosed Mrs. Godfrey with low back pain, right radicular syndrome, lower extremity pain, neck pain, and incontinence, and that these conditions impaired her 70% of the time. In a second assessment of Mrs. Godfrey's physical capacities filled out by Dr. Grange on May 4, 2007, he indicated that Mrs. Godfrey could sit, stand, and walk for twenty minutes at a time, and could sit, stand, and walk for a total of two to three hours each throughout the day. He also stated that Mrs. Godfrey must lie down one to three times a day for an hour at a time. Dr. Grange specified that Mrs. Godfrey could lift five pounds frequently, ten pounds occasionally, twenty pounds rarely, but should never lift fifty pounds or more. Lastly, he opined that Mrs. Godfrey could handle, grasp, and manipulate objects with her right and left arms 67-100% of the time, but could only reach or push and pull 0-33% of the time.

In May 2007, a series of MRIs of Mrs. Godfrey's spine showed mild central canal stenosis, or narrowing of the spinal column. An MRI of her thoracic spine showed that her bone marrow was within normal limits, the intervertebral discs were well hydrated, and that there were "no focal disc protrusions, central canal stenosis, neural foraminal stenosis or neural impingement." ®. 871.) The MRI of her lower back showed multifactorial mild central canal stenosis at L2-3, L3-4, and L4-5, and mild bilateral neural foraminal stenosis at L4-5 and L5-S1. The lower back MRI also showed multifactorial mild to moderate central canal stenosis at L4-5. After the MRIs, Dr. Grange recommended that Mrs. Godfrey continue with her stretching and exercise program and to continue with her pain medications. He also continued her permanent restrictions to "avoid heavy lifting" and "[f]requently change positions." ®. 869.)

At the hearing before Judge Jensen, Mrs. Godfrey testified that she has back problems, carpal tunnel syndrome, issues with her right shoulder, pulmonary embolisms, and obesity.  She stated that she experiences constant pain in her back and shoulder and pain from the carpal tunnel syndrome.  She said her back feels like it was crushed.  She claimed that lifting anything over five pounds aggravates her back condition.  Mrs. Godfrey testified that her back problem is the main thing that prevents her from working.  She claimed that the pain is so debilitating that she has to lie down two to three times per day and that she often does not get out of bed two days each week.  She stated that her doctors have recommended surgery on her low back, but Mrs. Godfrey testified that she is waiting until she can no longer walk.

She testified that at the end of 2007, she could spend fifteen to thirty minutes at a time doing housework for up to two hours per day, lift and carry about ten pounds, stand for five to ten minutes at a time, and sit for ten to fifteen minutes at a time.  She could walk for twenty minutes and climb one flight of stairs.  She estimated that she could write for twenty or thirty minutes, and type for between ten and fifteens minutes at a time.  She testified that her hands often go numb, which makes holding things difficult.

Mrs. Godfrey also testified that she has neck pain which causes migraine headaches, which she claims occur every day.  She claims that she is supposed to have surgery for this problem, but hasn't had the surgery yet.

At the hearing, vocational expert Kent Granat testified that a hypothetical individual with Mrs. Godfrey's limitations could work as a surveillance system monitor, call-out operator, and a telephone information clerk.

ANALYSIS

**I.     Standard of Review**

The court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied.  See Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  Substantial evidence "requires more than a scintilla but less than a preponderance."  Id.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (citation omitted).  The court "will not reweigh the evidence or substitute [its own] judgment for the Commissioner's . . . [and] may not displace the agency's choice between two fairly conflicting views," even if the court may have made a different choice had the matter been before it de novo."  Id. (citation omitted).  "A finding of no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence."  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992) (citations omitted).

**II.     Judge Jensen's Decision**

To receive disability benefits, a claimant must meet certain qualifications under the Social Security Act: the claimant must meet the insured status requirements, be less than sixty-five years of age and under a "disability."  Flint v. Sullivan, 951 F.2d 264, 267 (10th Cir.1991).

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act further provides that an individual shall be determined to be disabled

13

"only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

A person seeking Social Security benefits bears the burden of proving that because of her disability, she is unable to perform her prior work activity. See Miller v. Chater, 99 F.3d 972, 975 (10th Cir. 1996). Once the claimant establishes that she has a disability, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which she can perform exist in the national economy. See id.

The Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a) – (g); Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988). In the first two steps, the ALJ must determine whether the claimant is engaging in substantial gainful activity and whether the claimant has a "severe" impairment. 20 C.F.R. §§ 416.920(b) – ©. After these two steps, the next step involves determining whether the claimant's impairment is listed in or is comparable to any impairment listed in the "Listing of Impairments," 20 C.F.R. § 404, subpt. P, app. 1. Id. § 416.920(d). If the claimant is found to have an impairment meeting or equaling the listed impairments, she is entitled to benefits. Id. If not, the evaluation proceeds to steps four and five, which involve the assessment of the claimant's residual functional capacity. Id. §§ 416.920(e) – (g). At step four, the ALJ determines whether the claimant can perform her past work given her residual functional capacity. Id. § 416.920(e). If she cannot, the evaluation moves to step five, where the ALJ decides whether the claimant can

perform other available work in the national economy considering her age, education, past work experience, and residual functional capacity. Id. § 416-920(f).

Following the administrative hearing held on January 20, 2010, Judge Jensen found that: (1) Mrs. Godfrey was not engaging in substantial activity; (2) She suffered from several severe impairments, including disorders of the back, carpal tunnel syndrome, obesity, and right shoulder impingement syndrome; (3) Her impairments did not meet or medically equal one of the listed impairments; (4) Her residual functional capacity[2] prevented her from performing any of her past relevant work; and (5) Given her age, education, work experience, and residual functional capacity, Mrs. Godfrey could work as a surveillance system monitor, a call-out operator, and a telephone information clerk. Based on these findings, Judge Jensen concluded that Mrs. Godfrey was not disabled under the Social Security Act.

**III.     Judge Jensen Correctly Determined that Mrs. Godfrey is Not Disabled.**

Mrs. Godfrey challenges three aspects of Judge Jensen's decision. First, she argues that Judge Jensen improperly evaluated her credibility when he found that her complaints of pain were less than credible. Second, she alleges that Judge Jensen erred in evaluating her residual functional capacity. And third, Mrs. Godfrey challenges Judge Jensen's finding that Mrs. Godfrey was capable of performing other work.

---

[2]Judge Jensen found that Mrs. Godfrey could perform sedentary work including lifting ten pounds occasionally and less than ten pounds frequently, standing or walking for about six hours of an eight hour day, sitting for about six hours of an eight hour day, with no limitations of pushing or pulling or operating foot controls within a ten pound range, and reaching above shoulder height or work over-head only occasionally. He also found that she must be allowed to sit or stand at will, and can sit in fifteen to thirty minute increments, and stand in ten minute increments. And she can handle and finger frequently.

A.    Judge Jensen Reasonably Found that Mrs. Godfrey's Complaints were Less Than Credible.

Once the evidence demonstrates that a claimant has a medically determinable impairment that could reasonably be expected to produce the complained of symptoms, the ALJ must then "consider [the claimant's] assertions of severe pain and [] decide whether he believe[s them]." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir. 1993)).  To make this determination, the ALJ should consider factors such as:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Id.  The ALJ's decision must "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186 (July 2, 1996).

A credibility determination is generally treated as binding on review.  Henderson v. Colvin, Civil Action No. 13–1119–JWL, 2014 WL 2968165, at *2 (D. Kan. July 1, 2014) (citing Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990)).  The court's review of an ALJ's credibility determination is deferential.  Id.  "'Credibility determinations are peculiarly the province of the finder of fact' and will not be overturned when supported by substantial evidence."  Id. (quoting Wilson v. Astrue, 602 F.3d 1136, 1144 (10th Cir. 2010)).

Judge Jensen found that Mrs. Godfrey's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent" with the residual functional capacity assessment. (R. 412.) Judge Jensen supported this conclusion by pointing to several areas in the medical evidence record where Mrs. Godfrey's complaints did not match the medical evidence. For example, Judge Jensen noted that Mrs. Godfrey's physicians consistently recommended conservative treatment. Dr. Brown recommended only conservative treatment for Mrs. Godfrey's back pain and headaches, including injections, physical therapy, anti-inflammatories and pain medications. Mrs. Godfrey also only received conservative treatment from Dr. Young following her rotator cuff surgery. These conservative treatment recommendations are consistent with Mrs. Godfrey's statements to her doctors that her pain was "at a level 1 on a scale of 1-10" when managed with injections and pain medications, and Dr. Young's evaluation that her progress was excellent and she was achieving a good range of motion following her rotator cuff surgery.

Judge Jensen also based his credibility determination on the references in the record of Mrs. Godfrey's tendency to magnify the extent of her symptoms even where the medical evidence did not support her subjective complaints of pain. When Mrs. Godfrey was examined by Dr. Chung in January 2002, he found that she had "a plethora of subjective complaints of pain and discomfort without objective findings consistent with a neuromuscular origin" to support her assertions and complaints of pain. (R. 412.) And when a medical panel evaluated Mrs. Godfrey in 2003, the panel noted throughout the examination that "manual muscle tests and sensory pattens were inconsistent and some exaggeration of behavior was obvious, making a final interpretation somewhat difficult." (R. 413.)

Judge Jensen's decision was based on a review of the medical evidence, Mrs. Godfrey's statements to her doctors that her pain had improved and that pain medication helped, instances of symptom magnification, and the conservative treatment programs recommended by her doctors. The court finds no error in Judge Jensen's determination that Mrs. Godfrey's complaints were not entirely credible and accordingly finds that Judge Jensen adequately supported his decision to discredit Mrs. Godfrey's subjective testimony.

B.  <u>Judge Jensen Did Not Err in Determining Mrs. Godfrey's Residual Functional Capacity.</u>

A claimant's residual functional capacity is the most he or she can still do despite any limitations caused by his or her impairments and any related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's residual functional capacity, the ALJ considers all the relevant evidence in the record.

Mrs. Godfrey argues that Judge Jensen failed to consider Mrs. Godfrey's subjective complaints of pain when he determined her residual functional capacity and that his residual functional capacity assessment was conclusory and not supported by reference to the evidence in the record.

As discussed above, the ALJ gave little weight to Mrs. Godfrey's complaints and accordingly did not give them much consideration when he determined her residual functional capacity. Judge Jensen pointed to numerous areas in the record to support his finding that Mrs. Godfrey could perform sedentary work including lifting ten pounds occasionally and less than ten pounds frequently; stand or walk for about six hours of an eight hour day in ten minute increments; sit for about six hours of an eight hour day in fifteen to thirty minute increments; no

limitations of pushing or pulling or operating foot controls within a ten pound range; reach above shoulder height or work over-head only occasionally; and handle and finger frequently.

In his analysis, Judge Jensen addressed Dr. Grange's report on Mrs. Godfrey's physical capacities, which indicated Dr. Grange's belief that Mrs. Godfrey could sit, stand, and walk for twenty minutes at a time; sit, stand, and walk for a total of two to three hours each throughout the day; lie down one to three times a day for an hour at a time; lift five pounds frequently; lift ten pounds occasionally, lift twenty pounds rarely; never lift fifty pounds or more; and handle, grasp, and manipulate objects with her right and left arms 67-100% of the time, but could only reach or push and pull 0-33% of the time. Judge Jensen noted that most of Mrs. Godfrey's limitations as defined by Dr. Grange are not inconsistent with his own residual functional capacity assessment and were "readily accommodated in the residual functional capacity provided, with the exception for sleeping more than one and one-half hours during the workday." ®. 413.) Judge Jensen based this conclusion on his review of the entire record, his finding that Mrs. Godfrey's complaints were not credible and Dr. Grange's report.

Additionally, there is substantial evidence in the record to support Judge Jensen's conclusion that Mrs. Godfrey could perform a range of sedentary-work. Several medical opinions in the record indicated that Mrs. Godfrey had limitations similar to those found by Judge Jensen. ®. 226-33, 257-63, 823-30.) For example, Dr. Taggart found that Mrs. Godfrey could occasionally lift twenty pounds and frequently lift ten pounds; "stand and/or walk (with normal breaks) for a total of – about 6 hours in an 8-hour day;" and sit for about "6 hours in an 8-hour workday." ®. 227.) Dr. Sander also observed that she could lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk about six hours in an eight-hour workday;

sit for about six hours in an eight-hour workday; and had some postural limitations and a possible shoulder impingement that limited her ability to reach.

Judge Jensen's assessment of Mrs. Godfrey's residual functional capacity was based on a review of all the medical evidence, including Dr. Grange's report on Mrs. Godfrey's limitations. The court finds no error in Judge Jensen's analysis and conclusion that "[t]he objective evidence does not support impairments of such significance as to prevent [Mrs. Godfrey] from working at a full-time substantial gainful activity level." ®. 414.) For these reasons, the court finds that Judge Jensen's assessment of Mrs. Godfrey's residual functional capacity was reasonable and supported by substantial evidence.

C.    Judge Jensen Did Not Err in Determining that Mrs. Godfrey Could Perform Other Jobs in the National Economy.

The ALJ bears the burden at step five to show that there are jobs in the national economy that the claimant can perform with the limitations the ALJ has assessed. Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999) (citing Thompson, 987 F.2d at 1487). Mrs. Godfrey argues that the ALJ failed to meet his burden of proof at step give of the disability evaluation and should have found that Mrs. Godfrey is disabled.

As stated, Judge Jensen found that Mrs. Godfrey could perform sedentary work including lifting ten pounds occasionally and less than ten pounds frequently; stand or walk for about six hours of an eight hour day in ten minute increments; sit for about six hours of an eight hour day in fifteen to thirty minute increments; no limitations of pushing or pulling or operating foot controls within a ten pound range; reach above shoulder height or work over-head only occasionally; and handle and finger frequently. Based on this residual functional capacity, Judge Jensen found that Mrs. Godfrey could not perform any of her past relevant work, which included:

bank teller, a light skilled job; financial services sales representative, a light skilled job; data entry operator, a sedentary semi-skilled job; and administrative clerk; a light semi-skilled job.

Judge Jensen found that Mrs. Godfrey had certain limitations that prevented her from performing the full range of sedentary work. Based on these limitations that affected Mrs. Godfrey's ability to perform some of the requirements at the sedentary level, Judge Jensen asked vocational expert Kent Granat whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. Mr. Granat testified that given all of the factors and limitations, a hypothetical individual could perform several occupations, including: surveillance system monitor, call-out operator, and telephone information clerk.

Judge Jensen acknowledged that Mr. Granat's testimony was not consistent with the Dictionary of Occupational Titles "to the extent that a sit-stand option is not described for these or any other jobs." ®. 415.) In conformity with Social Security Ruling 83-12,[3] Judge Jensen asked Mr. Granat about the effect of Mrs. Godfrey's sit-stand limitation on the occupational base determined at step five. And as required by Social Security Ruling 00-4p, the ALJ elicited a reasonable explanation for the discrepancy. See also Rogers v. Astrue, 312 F. App'x 138, 141-42 (10th Cir. Feb. 17, 2009). Mr. Granat testified that he didn't believe it would affect Mrs. Godfrey's ability to do the jobs he believed she could perform and did not decrease the number of positions available in the national economy. Specifically, Mr. Granat stated that his experience and observations over the years led him to believe that Mrs. Godfrey's sit-stand

---

[3]"In cases of unusual limitations of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base." SSR, 83-12, 1983 WL 31253 (Feb. 26, 1979).

limitations would be accommodated. Judge Jensen found this to be a reasonable explanation for the discrepancy between Mr. Granat's testimony and the Dictionary of Occupational Titles.

Judge Jensen's decision was reasonably based on the vocational expert's testimony. Accordingly, the court finds no error in Judge Jensen's determination that Mrs. Godfrey is capable of performing certain sedentary jobs in the national economy and is not disabled.

CONCLUSION

For the reasons stated above, the court finds that Judge Jensen's decision is supported by substantial evidence. His ruling is therefore AFFIRMED.

SO ORDERED this 16th day of July, 2014.

BY THE COURT:

TENA CAMPBELL
United States District Judge